**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL ACTION |
| NAKALE MITCHELL | NO. 26-38 |

**Pappert, J.**                                                                    **July 21, 2026**

## MEMORANDUM

Two Philadelphia police officers arrested Nakale Mitchell in North Philadelphia suspecting he possessed a stolen U-Haul truck.  While one officer was placing Mitchell in the back of the patrol car, the other searched a black duffel bag Mitchell had been carrying, the contents of which included a loaded semi-automatic pistol and thousands of dollars' worth of unscratched lottery tickets sealed in plastic.  A federal grand jury charged Mitchell with three counts of robbery which interferes with interstate commerce, three counts of using and carrying a firearm during and in relation to a crime of violence and one count of possession of a firearm by a felon.  Mitchell moves to suppress the firearm, lottery tickets, other physical evidence the officers seized from him and certain statements he made to the officers after they placed him in custody.

After considering the parties' filings and holding an evidentiary hearing, the Court denies Mitchell's motion in part and grants it in part.  The officers had probable cause to arrest Mitchell.  The search-prior-to-transportation rule permitted the officers to search Mitchell's bag.  And even if the officers unlawfully searched his bag, the police would have found the firearm and lottery tickets during an inventory search at the

1

police station.[1]  But because the officers failed to read Mitchell his *Miranda* rights, the Court suppresses any statements he made in response to the officers' custodial interrogation.

I

On November 29, 2025, Philadelphia Police Officers Camilo Molina and Michael Wolf received an automatic-license-plate-reader alert that a U-Haul box truck reported stolen was parked on the 1200 block of East Erie Avenue in North Philadelphia.[2]  (Tr. of Evidentiary Hr'g at 13:4–8, 21:8–11, Molina.)  They went to the truck's location, confirmed it was reported stolen and then surveilled it, waiting for "someone to get into the vehicle."  (*Id.* at 13:10–14, Molina); *see* (*id.* at 45:1–3, Wolf).  A short time later, Nakale Mitchell approached the truck carrying a black duffel bag in his left hand and a key ring in his right hand that included keys to the truck.  (*Id.* at 13:18–19, 14:16–18, 28:3–8, Molina); (Body-Worn Camera Footage at 18:35, Ex. A.)  After Mitchell opened the driver-side door, Molina and Wolf arrested him, suspecting he possessed a stolen vehicle.  (Tr. of Evidentiary Hr'g at 14:13, Molina.)  While Molina was putting Mitchell, who was handcuffed, into the back of the patrol car, Wolf placed Mitchell's bag on the hood of the car and searched it.  (*Id.* at 14:16–18, Molina); *see* (Body-Worn Camera Footage at 18:35–37, Ex. A).  Inside he found a loaded firearm and thousands of dollars'

---

[1]    In addition to the firearm and lottery tickets, Mitchell moves to suppress a key ring he was carrying, numerous vapes and a cell-phone.  As the Court explains, the search-incident-to-arrest rule permitted the officers to seize the key ring.  It is unclear whether Mitchell was carrying the vapes and cell-phone on his person, or whether those items were in his bag.  If he was carrying the vapes and cell-phone, the items are admissible under the search-incident-to-arrest rule.  If the vapes and cell-phone were in his bag, the items are admissible under the search-prior-to-transportation rule and the inevitable-discovery doctrine.

[2]    Many police cars have cameras that can scan license plates and report whether a certain vehicle is reported stolen.  (Tr. of Evidentiary Hr'g at 19:22–25, 20:1–8.)

2

worth of unscratched lottery tickets sealed in plastic.  (Tr. of Evidentiary Hr'g at 45:25, 46:1–2, Wolf); *see* (Body-Worn Camera Footage at 18:39–44, Ex. B).

II

A

Mitchell first argues the police violated his Fourth Amendment rights when they arrested him and searched his bag.  The Reasonableness Clause of the Fourth Amendment, applicable to state officers through the Fourteenth Amendment, provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  An arrest in public is a reasonable seizure if the officers have probable cause that the arrestee committed a crime.  *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). Probable cause means the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). Probable cause is not a "high bar."  *Kaley v. United States*, 571 U.S. 320, 338 (2014).  It demands only a "probability" that the suspect has violated, is violating or is about to violate a criminal statute.  *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983).  When deciding whether this probability exists, courts must view the circumstances through the common-sense lens of ordinary people, not the technical lens of trained lawyers. *See Florida v. Harris*, 568 U.S. 237, 244 (2013).

Officers Molina and Wolf had probable cause to arrest Mitchell.  In Pennsylvania, a person may not intentionally retain another's property knowing it has

3

been stolen.  18 Pa. Stat. and Cons. Stat. Ann. § 3925(a).  Nor may a person exercise unlawful control over another's property with the intent to deprive him of it.  *Id.* § 3921(a).  And a person may not operate a car without the owner's consent.  *Id.* § 3928(a).  Here, while on routine patrol, Officers Molina and Wolf received an alert that a U-Haul truck reported stolen was parked on the 1200 block of East Erie Avenue in North Philadelphia.  They went to the truck's location, confirmed it was reported stolen and surveilled it.  A short time later, Mitchell approached, carrying the keys to the truck and a black duffel bag.  He opened the truck's driver-side door and attempted to enter it.  When a person operates a vehicle, he possesses the vehicle and "can reasonably be presumed aware of its ownership."  *Rohde v. City of Roseburg*, 137 F.3d 1142, 1144 (9th Cir. 1998).  And it is "probable that the driver of a stolen car is either the thief himself or is aware that the car has been stolen."  *Id.*  Thus, when a police officer "has reliable information, such as a police report, indicating that [a] vehicle has been stolen," he has "probable cause to believe that the driver has committed the crime of either stealing the car or knowingly operating a stolen vehicle."  *Id.*

Because Mitchell was attempting to enter a reportedly stolen U-Haul truck, Officers Molina and Wolf had probable cause to believe he (1) retained the truck knowing it was stolen, (2) exercised unlawful control over the truck with intent to deprive the owner of it and (3) had operated, or would operate, the truck without the owner's consent.  *See, e.g.*, *Miller v. City of Nichols Hills Police Dep't*, 42 F. App'x 212, 216 (10th Cir. 2002) (concluding that a police "report indicating that [a] vehicle had been reported as stolen . . . [is] sufficient to provide probable cause for [an] arrest"); *Pop v. Brookfield Chrysler Dodge Jeep, Inc.*, No. 24-1201, 2025 WL 1010448, at *5 (6th Cir.

4

Apr. 2, 2025) (a "stolen vehicle report is sufficient for probable cause"); *Sanders v. City of Philadelphia*, 209 F. Supp. 2d 439, 442 (E.D. Pa. 2002) (a person's "presence in a stolen automobile gives sufficient probable cause to warrant arrest"); *Apostol v. City of New York*, No. 11-CV-3851, 2014 WL 1271201, at *4 (E.D.N.Y. Mar. 26, 2014) (officers had probable cause to arrest an individual in a car reported stolen); *Woods v. Roth*, No. 11-14444, 2014 WL 1304425, at *5 (E.D. Mich. Mar. 31, 2014) (a person's "voluntary presence in a stolen car provides probable cause for arrest"); *Smith v. Township of Clinton*, No. 17-935, 2018 WL 4188457, at *5–6 (D.N.J. Aug. 31, 2018) (an officer had probable cause to arrest individuals in a car reported stolen); *see also Dorato v. Smith*, 108 F. Supp. 3d 1064, 1143 (D.N.M. 2015) ("Several courts have held that an officer has probable cause to arrest the driver of a vehicle for stealing the vehicle or for knowingly operating a stolen vehicle if the vehicle has been reported stolen.")

Mitchell emphasizes he had the truck's key and denied stealing the truck when the officers arrested him. But the fact that Mitchell had the keys to the truck supports, or at least is consistent with, the belief that he committed any of the three crimes described above. And a suspect's denial of a crime obviously does not negate probable cause. *Cameron v. Craig*, 713 F.3d 1012, 1019 (9th Cir. 2013); *see Pop*, 2025 WL 1010448, at *5 (explaining it would make little "sense if mere protestations of innocence from a suspect whose vehicle is listed as stolen could defeat probable cause"); *United States v. Carter*, No. 20-cr-62, 2021 WL 2592561, at *5 (S.D. Ohio June 24, 2021) ("[M]ost persons who are caught in a criminal act would deny liability for that crime, so [a suspect's] protestations of innocence cannot undo the probable cause that the stolen vehicle report created.").

Mitchell next argues that before his arrest he did not "demonstrat[e] in any objective fashion" that he was "doing anything wrong."  (Tr. of Evidentiary Hr'g at 77:2–3.)  For example, he says, the truck was parked on a "street where there's other traffic" and he walked to the truck "nonchalantly," made "no furtive movements," was not "fiddling around" and "act[ed] like a person" who "has every right to use" the truck. (*Id.* at 74:20–25.)  All of this is beside the point—he unlocked and was proceeding to get into a truck reported stolen, which suffices for probable cause.

Mitchell also points out that people routinely rent U-Haul trucks and then allow other individuals to drive them.  (*Id.* at 76:1–4.)  Thus, he concludes, "there could have been a perfectly valid reason that he had access to the car."  (*Id.* at 74:6–8.)  But probable cause concerns "the degree of suspicion that attaches to particular types" of conduct.  *Gates*, 462 U.S. at 243 n.13.

Finally, Mitchell contends that "had the officers conducted even the briefest investigation into the stolen vehicle," they "would have learned that the vehicle had only been reported stolen the day prior and that someone named 'Kyle' [Brown] had permission to use the vehicle."  (Mitchell's Mot. to Suppress at 9, Dkt. No. 26.)  But police officers need not "complete a full investigation before making a probable cause determination."  *Charron v. County of York*, 49 F.4th 608, 616 (1st Cir. 2022) (citation omitted).  Plus, the fact that the truck had been stolen a day before Mitchell's arrest does not affect the probable-cause calculus.  And Mitchell's name is Nakale Mitchell, not Kyle Brown.  Thus, if the officers knew someone named Kyle Brown had permission to use the truck, they would have had even more probable cause to arrest Mitchell.

B

Searches, like seizures, cannot be "unreasonable." U.S. Const. amend. IV. The Supreme Court has long held that officers may automatically search people when taking them into custody as an incident to their arrest for a crime. *Riley v. California*, 573 U.S. 373, 382–85 (2014). Under the search-incident-to-arrest rule, "[w]hen an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons" and "seize any evidence on the arrestee's person to prevent its concealment or destruction." *Chimel v. California*, 395 U.S. 752, 762–63 (1969). The permissible scope of a search incident to arrest also includes the area within the arrestee's immediate control—"the area from within which he might gain possession of a weapon or destructible evidence." *Id.* at 763. There must be a "reasonable possibility that the arrestee could access a weapon or destructible evidence in the . . . area being searched." *United States v. Shakir*, 616 F.3d 315, 321 (3d Cir. 2010).

The search-incident-to-arrest principle permitted the officers to search Mitchell and seize any evidence on him such as his key ring. The Government concedes, however, that this principle did not permit the officers to search Mitchell's bag. There is no reasonable possibility Mitchell could have accessed a weapon or destructible evidence in his bag because Officer Wolf searched it outside the front of the patrol car while Officer Molina was placing Mitchell, who was handcuffed, in the back of the car. *See id.*

C

The Government argues that Officer Wolf lawfully searched Mitchell's bag under the search-prior-to-transportation rule, which derives from *United States v. Matthews*, 532 F. App'x 211 (3d Cir. 2013).  In that case, the Third Circuit Court of Appeals held that "when a valid arrest has been made in a public place, which requires that the arrested person be transported from the scene, police may search any luggage that the person has in his possession at the time of the arrest, and which must accompany him to the police station, prior to transporting it." *Id.* at 224.  The Third Circuit justified this principle on "concerns for officer safety." *Id.*

*Matthews* permitted Officer Wolf to search Mitchell's bag.  The officers arrested Mitchell in public and they had to transport him and his bag to the police station. *Matthews* aside, the firearm and lottery tickets found in Mitchell's bag are admissible at trial under the inevitable-discovery doctrine.

D

The Fourth Amendment's text does not require any specific remedy when police illegally search a suspect's bag. *Arizona v. Evans*, 514 U.S. 1, 10 (1995).  The Supreme Court, however, has long adhered to a judge-made "exclusionary rule" that forbids the government from introducing evidence at a defendant's trial if the police uncovered it in violation of the Fourth Amendment. *Davis v. United States*, 564 U.S. 229, 236–38 (2011).  The rule discourages police officers from violating the Fourth Amendment by prohibiting them from using evidence found through illegal searches to obtain criminal convictions. *Elkins v. United States*, 364 U.S. 206, 209 (1960).

8

But the exclusionary rule generates "substantial social costs." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (citation omitted). Its "bottom-line effect" in many cases is to "set the criminal loose in the community without punishment." *Davis*, 564 U.S. at 237. Accordingly, the rule applies only if its benefits in stopping constitutional violations exceed its costs in permitting wrongdoers to escape punishment. *Id.*

Engaging in this cost-benefit balance, the Supreme Court has held that the government may introduce unlawfully obtained evidence if the evidence inevitably would have been discovered by lawful means. *Nix v. Williams*, 467 U.S. 431, 444 (1984). To exclude such evidence "adds nothing to either the integrity or fairness of a criminal trial." *Id.* at 446. The government must show that the inevitable-discovery doctrine applies by a preponderance of the evidence. *Id.* at 444 n.5. In deciding whether evidence would have been discovered, courts "focus[] on demonstrated historical facts capable of ready verification," not speculation. *Id.*; *United States v. Vasquez De Reyes*, 149 F.3d 192, 194 (3d Cir. 1998).

The police inevitably would have found the firearm and lottery tickets in Mitchell's bag during an inventory search at the police station. *United States v. Mendez*, 315 F.3d 132, 138 (2d Cir. 2002) (explaining the government often "successfully invokes the inevitable discovery exception on the basis of inventory search procedures"). The Supreme Court has long held "it is reasonable for police to search the personal effects of a person under lawful arrest as part of the routine administrative procedure at a police stationhouse incident to booking and jailing the suspect." *Illinois v. Lafayette*, 462 U.S. 640, 643 (1983). An inventory search aims not to look for criminal evidence, but "to protect an owner's property while it is in the custody of the police, to

9

insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Colorado v. Bertine*, 479 U.S. 367, 372 (1987).  To be lawful, "inventory searches must be conducted according to standardized criteria or established routine, consistent with the purpose of a non-investigative search." *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010) (citation omitted).  The government may prove the existence of a valid standardized inventory search procedure "by reference to either written rules and regulations or testimony regarding standard practices." *Id.* at 290 n.5 (citation omitted).

Philadelphia Police Department Directive 5.7 establishes the standard departmental procedure regulating inventory searches.  When a police officer arrests an individual in public carrying luggage and "the arresting officer has no reason to believe that the luggage contains contraband or evidence, the luggage shall be seized" and (1) "[p]laced on a Property Receipt" and (2) "[t]he luggage will be opened and inventoried in the presence of the person from whom it was seized.  Items will be listed on the pertinent property receipts." (Directive 5.7 at 3, Dkt. No. 30-2.)  The directive also provides that "[p]roperty of different categories inside the luggage" (such as "medicine, money, jewelry") "must be placed on separate property receipts." (*Id.*)  Directive 5.7 seeks to protect the arrestee's property and shield the officers from claims of loss or damage. *Mundy*, 621 F.3d at 291.  The directive also sufficiently regulates the scope of the search, directing officers to inventory property found within the arrestee's luggage. *Id.*  Officer Wolf confirmed that if he did not search Mitchell's bag at the scene of his arrest, the bag would have been searched at the police station.  He testified that after an individual carrying luggage is arrested, an inventory search "would occur at

10

the police station," where an officer creates an "inventory [of] [the] individual's property." (Tr. of Evidentiary Hr'g at 49:18–24.) Thus, Officer Wolf explained, Mitchell's bag "would have [been] inventoried," (*id.* at 49:7–8), and was in fact inventoried "back at the station" after his arrest, (*id.* at 54:12–13). Because the firearm and lottery tickets in Mitchell's bag "would have been discovered pursuant to a valid inventory search at the police station when [he] was processed," they are admissible at trial under the inevitable-discovery doctrine. *Matthews*, 532 F. App'x at 225; *see United States v. Allen*, 173 F.4th 543, 550 (4th Cir. 2026) ("[T]he contents of the bag would inevitably have been lawfully discovered pursuant to the applicable inventory search policy that required the search of Allen's bag during his intake processing at the Wake County Detention Center."); *United States v. Maxwell*, No. 23-cr-00026-7, 2024 WL 200887, at *11 n.31 (E.D. Pa. Jan. 18, 2024) (concluding that a bag "would have been legally searched pursuant to the inventory procedures of the Philadelphia [Police Department]"); *United States v. Savery*, No. 24-551, 2025 WL 1165607, at *8 (D.N.J. Apr. 22, 2025) (concluding the police would have inevitably discovered a gun, drugs, and cash in an arrestee's bag during an inventory search at the police station).

### III

Mitchell also argues that certain statements he made to Officers Molina and Wolf after they placed him in custody should be suppressed. The Fifth Amendment, applicable to state officers through the Fourteenth Amendment, provides that an individual may not be "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To protect this right, the Supreme Court requires law-enforcement officers to give warnings, including the right to remain silent, before

interrogating individuals whom the officers have placed in custody.  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *Stansbury v. California*, 511 U.S. 318, 322 (1994). Generally, courts honor *Miranda* by suppressing unwarned statements.  *Oregon v. Elstad*, 470 U.S. 298, 308 (1985); *see Alston v. Redman*, 34 F.3d 1237, 1243 (3d Cir. 1994) ("The remedy for a violation of *Miranda* . . . is straightforward—any statement given in violation of the rule[] . . . cannot be introduced into evidence in the state's case-in-chief.").  As the Government agrees, Officers Molina and Wolf failed to read Mitchell his *Miranda* rights after they placed him in custody.  Thus, the Court will suppress any statement Mitchell made in response to the officers' questions after his arrest.  *See* (Tr. of Evidentiary Hr'g at 71:13–20) (explaining Mitchell's motion is "granted with respect to any statements made" by Mitchell "in response to questions asked after [Mitchell] was placed under arrest").

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*

Gerald J. Pappert, J.

12